**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION**

**K.S.J., A MINOR; GILBERT CUZDEY; AND
NATALIE CUZDEY.; INDIVIDUALLY AND
AS FOSTER PARENTS AND NEXT FRIENDS
OF THE MINOR CHILD, K.S.J.**            **PLAINTIFFS**

**v.**            **CIVIL ACTION NO.: 3:23-CV-00465-MPM-RP**

**MISSISSIPPI DEPARTMENT OF CHILD
PROTECTIVE SERVICES, et al.**            **DEFENDANTS**

**ORDER**

This cause comes before the court on the motion of the Mississippi Department of Child Protective Services ("CPS") to dismiss this action, pursuant to Fed. R. Civ. P. 12. Plaintiffs Gilbert and Natalie Cuzdey have responded in opposition to the motion, and the court, having considered the memoranda and submissions of the parties, is prepared to rule.

Plaintiffs filed the instant action seeking monetary damages against CPS for what they allege to be the race-based decision to terminate their foster parent privileges and to remove their foster child KJ from their custody.[1] CPS' stated reason for removing KJ from plaintiffs' custody was findings of abuse against the child, but plaintiffs contend that these findings were unsupported by substantial evidence and that the real reason for defendant's action was prejudice against their inter-racial family relationship. Plaintiffs sought recovery in this regard pursuant to 42 U.S.C. § 671(a)(18), which forbids race and other related forms of discrimination by

---

[1] This court notes that the amended complaint refers to the minor child as "K.S.J." while the hearing officer referred to him as "KJ." This court will generally use the latter abbreviation in the interest of brevity.

federally-funded state agencies involved in adoption or foster care placements. Defendant has

presently moved to dismiss, arguing that it is entitled to sovereign immunity pursuant to the

Eleventh Amendment or that, alternatively, plaintiffs have failed to state a claim against it under

FRCP 12(b)(6).

In considering defendant's motion, this court begins with the allegations of the amended

complaint, which asserts that:

> 8. The minor child at issue is K.S.J., who is approximately four (4) years old. The child
> was born out of wedlock to a mother and unknown father in 2019. Not long
> thereafter, the child was surrendered to or otherwise came into the custody of
> Mississippi Department of Child Protective Services ("CPS"). The rights of the
> biological parents were subsequently terminated, and the child was placed into the
> foster care program administered by CPS and made potentially ready for adoption.
> 9. Gilbert Cuzdey, Jr. and Natalie Cuzdey, are adult resident citizens of Marshall
> County, Mississippi, and resided in Marshall County at the time of the events giving
> rise to their claims.
> 10. The Cuzdeys desired to foster and ultimately adopt a child through cooperation
> with CPS.
> 11. CPS was aware that the Cuzdey's purpose for becoming a licensed foster home was
> to adopt a child.
> 12. CPS granted a foster license to the Cuzdeys on or about January, 2022.
> 13. On or about March 17, 2022, CPS placed K.S.J. in the foster care of the Cuzdeys.

[Amended complaint at 3-4]. In describing defendant's decision to remove KJ from their

custody, plaintiffs allege that:

> 14. On or about September 8, 2022, but without requisite court approval, CPS
> maliciously and in a manner that was retaliatory, malicious, arbitrary, and
> capricious revoked the Cuzdeys' foster license and removed the child, K.S.J., from
> their home in Marshall County, Mississippi. In doing so, CPS disregarded its policy
> and procedures for removal. See Exhibit B, at p. 19 (referencing CPS Investigations
> Policy & Procedure Section 7.1 Removals Due to Substantiated Investigation; Section 7.2
> Reasonable Efforts; Section 7.4. Facilitating Removals.) In part, CPS imposed these
> draconian measures on the Cuzdeys and the child based upon its erroneous
> conclusions of abuse and neglect—all of which lacked any merit whatsoever.

[*Id.* at 4].

In their complaint, plaintiffs describe how they successfully appealed CPS' decision to

revoke their foster privileges, as follows:

> 16. The Cuzdeys timely filed their notice of intent to administratively appeal the actions of CPS and its employees. Over the course of two days in early 2023 at CPS headquarters in Jackson, Mississippi, the Cuzdeys tried their administrative appeal regarding the wrongful removal of K.S.J. The *Hearing Officer's Findings of Fact, Conclusions of Law, and Recommendations* ("the ruling") were made to CPS on April 7, 2023, and subsequently distributed to the parties following CPS review. *See* Exhibit B.
>
> 17. A true and correct redacted copy of the ruling is attached as Exhibit B. The ruling is an extensive condemnation of CPS's actions regarding its baseless allegations of abuse and neglect leveled against the Cuzdeys, its investigations of those allegations, the removal of the child, the revocation of the Cuzdeys' foster license, and the closure of their foster home. The instances of impropriety and malfeasance committed by CPS are so numerous and so malignant that they span 37 pages and include failing to produce investigatory records, not adhering to departmental policy, erroneously reaching "substantiated" conclusions based upon non-credible evidence, failure to investigate anything that might lead to a result inconsistent with the CPS's prior actions, ignoring the opinions of its renowned medical expert, encouraging treating medical professionals to alter records to bolster CPS's position, alluding to racially discriminatory allegations raised by the Cuzdeys, imposing outcomes not supported by the evidence, retaliating against the Cuzdeys for being bold enough to indicate they would hire a lawyer, as well as concealment and failure to produce all discoverable documents in the course of the administrative appeal. Indeed, all of CPS's outrageous conduct cannot be succinctly summarized. Therefore, the ruling, the facts recited therein, and the hearing's officer's analysis of the same are instead adopted herein by reference in support of the claims herein asserted.

[*Id.* at 4-5].

Plaintiffs allege that, in spite of obtaining a favorable appellate ruling which was harshly

critical of CPS conduct in this case, defendant continued to show reluctance to return KJ to their

custody:

> 20. Despite the ruling in the administrative appeal, CPS officials later failed to adhere to a directive of the Marshall County Youth Court to reopen the Cuzdeys' foster home. Later still, CPS employees sought to impose tedious and burdensome prerequisites upon the return of the child, based upon the very allegations already found to have been baseless and despite the fact that such conditions had not been imposed while the allegations were first being investigated and the child remained in the home. Thus, CPS continued, post-appeal and contrary to court order, to wrongfully withhold K.S.J. from the Cuzdeys and failed to reopen their foster home. CPS's

ongoing refusal forced the Cuzdeys' to file a Petition for Habeas Corpus in Youth Court.

21. On August 1, 2023—10 weeks after the Commissioner's acceptance of the findings and 11 months after K.S.J.'s wrongful removal—the Youth Court of Marshall County granted the Cuzdeys' Petition for Habeas Corpus thereby ordering K.S.J. to be reunited with the Cuzdeys, but over a graduated schedule to re-introduce K.S.J. to the Cuzdeys.

22. Then suddenly, on on about September 22, 2023, with no more than a few hours' notice, an emergency hearing was remotely conducted by the Youth Court in which it was announced that the then-current interim foster mother of K.S.J. wanted him removed from her home that very afternoon. Thus, via an emergency placement order, K.S.J. was finally returned to the Cuzdeys' home—379 days after K.S.J. was wrongfully removed from their home—where he now happily resides with the Cuzdeys. The Cuzdeys are proceeding with their intentions to adopt K.S.J., unless CPS retaliates once again to disrupt that process.

[Complaint at 6-7].

With the foregoing allegations in mind, this court first addresses defendant's argument that it is protected by sovereign immunity in this case. The Eleventh Amendment of the United States Constitution provides that:

> The Judicial power of the United States shall not be construed to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens or another State, or by Citizens or Subjects of any Foreign State.

The Eleventh Amendment grants a state immunity from suit in federal courts by citizens of other states and by its own citizens. *Lapides v. Board of Regents of the University System of Georgia*, 535 U.S. 613, 616; 122 S. Ct. 1640 (2002). The Eleventh Amendment bars both federal and state law claims for monetary damages asserted against a state in federal court. *Pennhurst State School and Hospital v. Halderman,* 465 U.S. 89, 119-21; 104 S. Ct. 900 (1984). A limited exception to a federal court's general lack of jurisdiction over claims against a state is its ability to order prospective injunctive relief against a state official to prevent violations of federal law. *Ex parte Young*, 209 U.S. 123 (1908).

It is undisputed that CPS is a state agency, and, in "reading between the lines" of the original complaint in this case, it appears that plaintiffs recognized early on that Eleventh Amendment immunity would pose a significant obstacle to their claims. Indeed, plaintiffs originally asserted discrimination claims against individual CPS employees alongside the agency itself, apparently based upon a recognition that Eleventh Amendment immunity offers no protection as to claims against state employees in their individual capacities. Moreover, plaintiffs initially chose to assert their claims under 42 U.S.C. § 1983, even though, as discussed below, the U.S. Supreme Court has held that states are not proper defendants in § 1983 actions. *Will v. Michigan Dept. of State Police*, 491 U.S. 58 (1989).[2]

After defendant raised this and other arguments in its first motion to dismiss, plaintiffs responded by filing an amended complaint in which they asserted discrimination claims solely against CPS. Moreover, plaintiffs appear to have done additional research into the law in this context and reached a belated recognition that Congress has passed certain statutes in which it expressed a clear intent to bypass Eleventh Amendment immunity in cases where, as here, state agencies receiving federal funds are alleged to have violated federal anti-discrimination laws. *See* 42 U.S.C. § 2000d–7. As discussed below, this court concludes that these statutes provide

---

[2] This court notes that, aside from *Will*'s holding that states are not "persons" under § 1983, the U.S. Supreme Court held in a separate decision that § 1983 does not abrogate Eleventh Amendment immunity. *See Quern v. Jordan*, 440 U.S. 332 (1979). However, it is not clear to this court that this would necessarily bar a plaintiff from suing a state under § 1983 (if *Will* had not been decided) if Congress had abrogated or provided for the waiver of sovereign immunity in some other statute, such as 42 U.S.C. § 2000d–7 in this case. *Will* strikes this court as being a more intractable obstacle to a § 1983 claim against a state however, and it will accordingly assume for the purposes of this order that plaintiffs could not assert their claims in this case under § 1983. Certainly, plaintiffs appear to be operating under the assumption that this is the case, and their assumption strikes this court as the correct one.

plaintiffs with a much stronger basis for bypassing Eleventh Amendment immunity than was the case with the § 1983 claims set forth in their original complaint.

Before discussing the federal statutes upon which plaintiffs rely, this court notes that, in *Green v. Mansour*, the U.S. Supreme Court wrote that "[i]n order to determine whether Congress has abrogated the States' sovereign immunity, we ask two questions: first, whether Congress has 'unequivocally expresse[d] its intent to abrogate the immunity," 474 U.S. 64, 68 (1985) "and second, whether Congress has acted 'pursuant to a valid exercise of power.'" *Seminole Tribe of Florida vs. Florida*, 517 U.S. 44, 56 (1996).

In arguing that Congress did, in fact, unequivocally express its intent to bypass sovereign immunity in cases such as this one, plaintiffs rely upon 42 U.S.C. § 2000d–7, which provides that:

> (1) A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973, title IX of the Education Amendments of 1972, the Age Discrimination Act of 1975, title VI of the Civil Rights Act of 1964, *or the provisions of any other federal statute prohibiting discrimination by recipients of federal financial assistance.*

*Id.*

It is § 2000d–7's residual or "catch all" clause, noted in italics above, which is at issue in this case. Under the plain language of this clause, Congress expressed its intent that states not be allowed to claim Eleventh Amendment immunity in cases where they violate any "federal statute prohibiting discrimination by recipients of federal financial assistance." It is undisputed that CPS does, in fact, accept federal funding, and plaintiffs' claims against the agency are based upon 42 U.S.C.S. § 671(a)(18), which provides that:

> (18) not later than January 1, 1997, provides that neither the State nor any other entity in the State that receives funds from the Federal Government and is involved in adoption or foster care placements may—

(A) deny to any person the opportunity to become an adoptive or a foster parent, on the basis of the race, color, or national origin of the person, or of the child, involved; or
(B) delay or deny the placement of a child for adoption or into foster care, on the basis of the race, color, or national origin of the adoptive or foster parent, or the child, involved.[3]

*Id.*

Section 671(a)(18) strikes this court as falling squarely within the wheelhouse of § 2000d–7(a)(1)'s residual clause, since it plainly prohibits discrimination on the basis of "race, color, or national origin of the adoptive or foster parent" by state entities which "receive[] funds from the Federal Government and [are] involved in adoption or foster care placements." *Id.* Given this language, it would be quite difficult for this court to conclude that this statute should not be regarded as one "prohibiting discrimination by recipients of federal financial assistance" within the meaning of § 2000d–7(a)(1).

This court further notes that Congress made its intent to hold state agencies receiving federal funds financially liable for their acts of race discrimination even clearer by creating a private right of action directly against state agencies for violations of § 671(a)(18). This statute is set forth in 42 U.S.C.S. § 674 and provides that "any individual who is aggrieved by a

---

[3] In discussing this residual clause, an Illinois district judge wrote that:

> Section 2000d–7 was enacted in response to the Supreme Court's decision in *Atascadero v. Scanlon*, 473 U.S. 234, 105 S.Ct.3142 (1985), which held that "mere receipt of federal funds" does not establish waiver of sovereign immunity, and that if Congress wishes to condition receipt of federal funds on waiver of immunity, it must make that intent "clear." Section 2000d–7 establishes "an unambiguous waiver of the States' Eleventh Amendment immunity." *Lane v. Pena*, 518 U.S. 187, 200, 116 S.Ct. 2092 (1996). Thus, section 2000d–7 is not a Congressional abrogation of state sovereign immunity … it instead establishes that states who receive federal funds have waived their sovereign immunity in those cases.

*Miraki v. Chicago State Univ.*, 259 F. Supp. 2d 727, 730 (N.D. Ill. 2003). This court agrees that § 2000d–7 is best regarded as a statute relating to the *waiver* of sovereign immunity, rather than its abolition, but it seems clear that the end result of sovereign immunity being bypassed remains the same.

violation of section 671(a)(18) of this title [42 U.S.C.S. § 671(a)(18)] by a State or other entity may bring an action seeking relief from the State or other entity in any United States district court." 42 U.S.C.S. § 674(d)(3)(A).

In the court's view, the enactment of § 674(d)(3)(A) removes any argument that § 671(a)(18) was not one of the "federal statute[s] prohibiting discrimination by recipients of federal financial assistance" which Congress had in mind when it provided for the waiver of sovereign immunity in § 2000d–7(a)(1)'s residual clause. Indeed, this court believes Congress' intent to be quite clear based solely on the language of § 2000d–7(a)(1), but it concludes that the enactment of § 674(d)(3)(A) removes any arguable doubt in this regard. It further seems clear to this court that, aside from serving as additional proof regarding congressional intent, the enactment of § 674(d)(3)(A) represented a decision by Congress to give § 671(a)(18) plaintiffs a statutory vehicle to bring claims against state agencies, in light of *Will*'s holding that a state is not a "person" amenable to suit under § 1983. *Will*, 491 U.S. at 66. In so concluding, this court notes that, in enacting § 674(d)(3)(A), Congress specifically used the word "state," thereby avoiding *Will*'s holding and removing any doubt as to whether it intended for states to be sued under the statute.

This court concludes that, by specifically enacting a statute - § 674(d)(3)(A) - which allows states to be sued for violations of the very same § 671(a)(18) relied upon by plaintiffs, and by further expressly stating in 2000d–7(a) that states "shall not be immune under the Eleventh Amendment … for a violation of … the provisions of any other federal statute prohibiting discrimination by recipients of federal financial assistance," Congress could not have been clearer regarding its intent. That is, Congress made its intent exceedingly clear that state agencies should be deemed to have waived sovereign immunity in cases where they accept

federal funds for their adoption programs and thereupon make adoption decisions on the basis of race discrimination.[4] Once again, there is no doubt that CPS does, in fact, receive federal funds, and this court reiterates its view that § 671(a)(18) cannot rationally be read as anything other than a statute falling squarely within 2000d–7(a)'s residual clause. Moreover, it strikes this court that, on a common-sensical level, it would be quite surprising if the same Congress which provided for states to be held financially liable for acts of racial discrimination against their employees via Title VII[5] would have wished to tolerate such discrimination in the adoption context. Indeed, the broad language of 2000d–7(a)'s residual clause and the enactment of § 674(d)(3)(A) remove any argument to the contrary, in this court's view.

In arguing otherwise, defendant relies upon dicta in a New Jersey district court decision which did not involve a § 671(a)(18) claim, but rather one asserted under § 671(a)(16). *See Charlie H. v. Whitman,* 83 F. Supp. 2d 476, 489 (D.N.J. 2000). This court believes that plaintiffs have very effectively rebutted defendant's reliance upon *Charlie H.* in their brief, [*id.* at 6-7], and it adopts their arguments here. In particular, this court agrees with plaintiffs that the single sentence in *Charlie H.* upon which defendant relies constitutes nothing more than ill-conceived dicta regarding a § 671(a)(18) claim which was not before the New Jersey judge and which he accordingly had no reason to have educated himself. In particular, the New Jersey judge offered an observation that:

> Moreover, as discussed above, that Congress recently chose to amend 42 U.S.C. § 674 to include a private right of action under § 1983 for a state or other entity's failure to comply with 42 U.S.C. § 671(a)(18), but did not include the other various elements enumerated in 42 U.S.C. § 671(a) and relied upon by Plaintiffs, is strong evidence that

---

[4]As noted previously, § 671(a)(18) also covers foster parents, but this court will refer to it as applying in the "adoption" context in the interest of brevity.
[5]*See Fitzpatrick v. Bitzer*, 427 U.S. 445, 447, 96 S. Ct. 2666, 2667 (1976)(holding that Congress validly abrogated Eleventh Amendment immunity in passing Title VII).

Congress did not intend these other various State plan elements in 42 U.S.C. § 671(a) to confer rights enforceable pursuant to § 1983.

*Charlie H.,* 83 F. Supp. 2d at 489. In its brief, defendant seizes upon the words "under § 1983" in the New Jersey judge's ruling and argues that plaintiffs should have filed their § 671(a)(18) claim under that statute, rather than the § 674(d)(3)(A) procedural vehicle with which Congress specifically provided them for this purpose. Once again, however, plaintiffs did file their claims under § 1983 in their original complaint, only to think better of this approach after defendant pointed out in its initial motion to dismiss that *Will* specifically forbids them from utilizing this statute to sue states. Defendant now relies upon two words from the above-quoted dicta in a non-binding New Jersey decision to argue that plaintiffs erred in relying upon § 674(d)(3)(A) in their amended complaint, instead of § 1983. This court does not find this argument to be well taken.

Given the context of the New Jersey judge's statement above, it seems clear to this court that he was simply trying to say that Congress only intended to allow states to be sued under a single provision of § 671(a), that being the very same § 671(a)(18) upon which plaintiffs rely in this case. In this sense, the New Jersey court's observation could be regarded as helpful authority for plaintiffs in this case. This court agrees with plaintiffs, however, that the New Jersey judge simply mis-spoke when he stated that Congress intended to accomplish this by making states subject to suit under § 1983. Not having a § 671(a)(18) case before him, as this court does, the New Jersey judge had no reason to have studied the provisions of § 674(d)(3)(A) and given thought to why Congress saw fit to enact this statute which, like § 1983, provides for a private right of enforcement for violations of federal law, but which, unlike § 1983, is limited to a specific statute - § 671(a)(18) - and which is specifically tailored to suits against "states." This court believes that, if the New Jersey judge had given thought to this issue, then he would have

arrived at the same conclusion this court does, namely that Congress was seeking to provide § 671(a)(18) plaintiffs with an enforcement vehicle which, unlike § 1983 as interpreted by *Will*, can be asserted against states.  Indeed, § 674(d)(3)(A)'s plain language indicating that plaintiffs "may bring an action seeking relief from the State" under the statute makes it clear that such was Congress' intent.

This court notes that other federal courts have specifically pointed to § 671(a)(18) as being the one § 671(a) provision in which Congress was absolutely clear regarding its intent to create a private right of action.  In *Johnson ex rel. Est. of Cano v. Holmes*, 377 F. Supp. 2d 1084 (D.N.M. 2004), for example, a New Mexico district court wrote that:

> Congress demonstrated that it wanted to create a private right of enforcement for § 671(a)(18) by including § 674(d)(3)(A) in the Act. Because Congress chose not to include a corresponding enforcement provision for § 671(a)(9), it is unclear whether Congress intended § 671(a)(9) to be privately enforceable.

*Id.* at 1101.  Given this clear expression of intent, it would have been nonsensical for Congress to have intended plaintiffs to use § 1983 to enforce § 671(a)(18), considering that it created a unique statutory tool for doing so by adopting § 674(d)(3)(A).

It thus seems clear that § 674(d)(3)(A) is the statutory hammer for § 671(a)(18)'s nail, and yet defendant seems to chastise plaintiffs for not using § 1983's screwdriver in their amended complaint.  It would, of course, make no sense at all for plaintiffs to do so in light of *Will*, and defendant should not be surprised when plaintiffs choose to utilize the statute which will allow them to prosecute their § 671(a)(18) claim, instead of seeing it dismissed.  This court further notes that *Will* was well-settled precedent in 1996 when Congress made § 671(a)(18) privately enforceable by enacting § 674(d)(3)(A).  That being the case, it would have been an epic exercise in futility for Congress to have gone through the trouble of making clear its intent to hold federally-funded state agencies liable for acts of racial discrimination, if it intended for

plaintiffs to essentially drive their § 671(a)(18) lawsuits into a ditch by asserting them under § 1983. Indeed, it seems clear to this court that Congress gave plaintiffs the § 674(d)(3)(A) enforcement vehicle precisely to avoid this result.

It appears that defendant itself tacitly recognizes the strength of plaintiffs' Eleventh Amendment arguments in light of their amended complaint, since it opposes this court's consideration of their sur-rebuttal arguments based not on their merit, but rather on the fact that plaintiffs should have raised them sooner. For example, defendant argues that:

> Plaintiffs' motion for leave to file a surrebuttal should be denied because Plaintiffs cannot show that a surrebuttal is necessary or warranted. All the arguments asserted in CPS's rebuttal were made in direct response and counterpoint to the arguments presented in Plaintiffs' oppositional response. While Plaintiffs can show no unfair prejudice in a denial of their instant motion, denying CPS the last word on their dispositive motion to dismiss would in fact be unfairly prejudicial to CPS.

[Brief at 1]. For its part, this court believes that plaintiffs' Eleventh Amendment arguments were already effectively stated in their responsive brief and that the sur-rebuttal brief is not, strictly speaking, necessary. Nevertheless, this court will allow plaintiffs to file their sur-rebuttal brief, since it does point out the fact that defendant's reply brief appears to ignore the existence of 42 U.S.C.S. § 2000d-7's residual clause. As stated previously, this clause makes clear Congress' intent to bypass sovereign immunity in cases involving statutes such as § 671(a)(18).

For the reasons previously stated, this court agrees with plaintiffs that § 671(a)(18) is properly regarded as a statute "prohibiting discrimination by recipients of Federal financial assistance" and that it thus falls squarely within the scope of § 2000d–7(a)(1)'s residual clause. In so stating, this court finds this case distinguishable from *Sossamon v. Texas*, 563 U.S. 277, 292, 131 S. Ct. 1651, 1662 (2011), where the Supreme Court found that a provision in the Religious Freedom Restoration Act of 1993 which prohibited "substantia[l] burden[s]" on the free exercise of religion was not 'unequivocally a 'statute prohibiting discrimination.'"

*Sossamon*, 563 U.S. at 292. In contrast to the free exercise claims in *Sossamon*, which were arguably personal liberty claims, § 671(a)(18) plainly bars states from making adoption decisions "on the basis of the race, color, or national origin of the adoptive or foster parent, or the child, involved." This court is unable to read this as anything other than an unequivocal anti-discrimination statute, and it therefore agrees with plaintiffs that *Sossamon* constitutes helpful authority for them, and not defendant, in this case.

This court's reading of precedent aside, it is very much unclear to it, on a common-sensical-level, why Congress would have *wished* to grant states the ability to discriminate on the basis of race in the specific context of making adoption decisions, given its generalized intent, expressed in § 2000d–7(a)(1)'s residual clause, to subject federally-funded state agencies to liability in cases where they discriminate on the basis of race. Indeed, this court finds it difficult to even *conceive* of a reason why Congress would have wished to permit federally-funded agencies to engage in racial discrimination in this one limited area, and defendant offers no such reason in its briefing. This court therefore concludes that, by enacting the three separate federal statutes discussed above, Congress made its intent to deny state agencies which accept federal funds the right to claim Eleventh Amendment immunity unequivocally clear, in cases where they are alleged to have made adoption or foster care decisions based upon race discrimination. Indeed, short of hiring a private plane to drag a banner over the Mississippi state capitol stating that it did not wish for states to be immune from liability when they discriminate on the basis of race in making adoption decisions, it is unclear to this court how Congress could have made its intent in this regard any clearer.

That brings this court to the second part of the sovereign immunity analysis, namely whether Congress, having unequivocally expressed its intent to abrogate sovereign immunity,

acted "pursuant to a valid exercise of power" in doing so. *See Seminole Tribe*, 517 U.S. at 56. Defendant does not appear to dispute that the § 2000d–7(a)(1) residual clause represents a valid exercise of Congress' enforcement powers under § 5 of the Fourteenth Amendment, but this court will briefly address this issue out of an abundance of caution. Considering the standards established by the U.S. Supreme Court in *City of Boerne v. Flores*, 521 U.S. 507, 512, 117 S. Ct. 2157, 2160 (1997), this court concludes that, by bypassing Eleventh Amendment immunity in cases where states discriminate on the basis of race in making adoption or foster care decisions, Congress acted pursuant to a valid exercise of its § 5 authority.[6]

In so concluding, this court notes that Mississippi has a long and lamentable history of racial discrimination, including in the adoption context. Particularly in light of this history, this court finds there to be a "congruence between the means used and the ends to be achieved" by Congress in enacting § 671(a)(18) and § 2000d–7(a)(1). *See Boerne*, 521 U.S. at 530. Indeed, this court can discern no valid reason why Congress would have had the authority to abrogate Eleventh Amendment immunity in the employment discrimination context, *see Fitzpatrick*, 427 U.S. at 447, yet lacked a similar authority to hold states financially accountable for racial discrimination in the adoption context. This court further notes that, if it were to reach a different conclusion on this issue, then this would seemingly open the door for the State of Mississippi to openly discriminate on the basis of race in making adoption decisions, with the only available recourse being the limited injunctive or declaratory relief made possible by *Ex parte Young*, 209 U.S. 123 (1908). This court can discern no policy or other justification for

---

[6] It is not entirely clear to this court that it is required to apply this part of the *Boerne* holding to § 2000d–7(a)(1), given that it involves a finding of the states' waiver, rather than an abolition by Congress, of sovereign immunity. Nevertheless, this court will address this issue out of an abundance of caution.

such a holding. That being the case, it strikes this court as entirely appropriate that Congress, in exercising its authority to enforce the Fourteenth Amendment, would have seen fit to provide states with financial incentives not to even *consider* discriminating on the basis of race in making adoption decisions.

This court thus concludes that Eleventh Amendment immunity does not bar plaintiffs' claims for monetary damages based on race discrimination pursuant to § 671(a)(18), but having so concluded, it must stress that they offer no arguments for bypassing sovereign immunity as to any other claims they might wish to assert. This includes any claim for retaliation, which plaintiffs do allege motivated defendant's actions but which they fail to allege as a cognizable federal claim. This court presumes that this is because plaintiffs recognize that, unlike race discrimination claims, a retaliation claim does not exist as a basis for recovery under the federal adoption statutes upon which they rely and, even if it did, it would likely be barred by Eleventh Amendment immunity. This court also notes that, in their original complaint, plaintiffs alleged certain state law tort claims, but they dropped those claims as well in their amended complaint, apparently based upon a recognition that they too would be barred by sovereign immunity. It thus seems clear that plaintiffs' original complaint was far too broad, but this court does give them credit for recognizing this fact on their own and correcting it.

Having decided that it has jurisdiction to consider plaintiffs' race discrimination claim under § 671(a)(18), this court now turns to defendant's alternative Rule 12(b)(6) motion to dismiss it on its merits. In support of this claim, plaintiffs assert in their amended complaint that "on or about September 8, 2022, but without requisite court approval, CPS maliciously and in a manner that was retaliatory, malicious, arbitrary, and capricious revoked the Cuzdeys' foster license and removed the child, K.S.J., from their home in Marshall County, Mississippi."

[Amended complaint at 4]. Plaintiffs further note that they filed an administrative appeal of defendant's ruling and that, following a two-day hearing, the hearing officer issued a thirty-seven (37) page order in which he reversed CPS's decision. This state appellate ruling serves as a primary basis for plaintiffs' discrimination claims in this case, and they contend that the ruling's "condemnation of [defendant's] lack of investigatory skills, baseless allegations, manipulation of the medical proof, and other transgressions" [brief at 17] casts doubt upon defendant's contention that it was simply acting in good faith based upon concerns for a child's safety.

In his order, the hearing officer noted that defendant began its investigation into plaintiffs in July 2022, after reports that Mr. Cuzdey had yelled at KJ and refused a nurse's offer of a diaper after the child had urinated on himself. [Hearing officer report at 2]. The hearing officer further wrote that, during the initial investigation, when asked whether he had ever physically disciplined KJ, Mr. Cuzdey admitted that he had once swatted his behind to get his attention. [Report at 3]. The hearing officer stated that, on August 24, 2022, defendant began a second investigation into plaintiffs after receiving a report that KJ appeared to be excessively hungry at daycare and that "he also came with a busted lip and said his foster parent hit him in the mouth." [*Id.* at 8].

The report notes that, when asked by the investigator Jill Franks what happens when he got in trouble at home, the boy responded that his father "whooped him with a belt on the butt" on one occasion. [*Id.* at 9]. The report also quotes the boy as telling Franks, when asked whether anyone at home was mean to him, that his father was, based on the whipping incident. *Id.* The report states that, on September 1, 2022, Franks again questioned KJ and that she did not notice any bruises or scars on him at that time. [*Id.* at 10]. The report notes, however, that when asked about an earlier cut lip which the boy had demonstrated, he stated that his father did it. *Id.*

When asked why his father had done that, the boy replied that he "was not being nice." *Id.* Later in his report, the hearing officer noted that Franks spoke with a teacher at KJ's school who confirmed that the boy had demonstrated a "busted lip" and that he had stated that his father had done it because he was "being mean." [*Id.* at 14].

In reversing the decision to revoke plaintiffs' foster rights, the hearing officer made numerous factual findings, including that what was described as a "busted lip" by CPS was, based on photographs, actually a very minor injury of uncertain origin. [*Id.* at 24]. The hearing officer further found that the boy's testimony was not credible, partly because he often gave non-sensical or non-responsive answers to questions and partly because he was a mere toddler who had just turned three years old. [*Id.* at 23-25]. Specifically, the hearing officer wrote that:

> [I]f the statement that Mr. Cuzdey hurt his lip really did come from KJ, I find them to be unreliable and not credible. First, in his interview with Franks, the three-year old did not tell her [that] Mr. Cuzdey hurt his lip, nor did he demonstrate how Mr. Cuzdey allegedly hurt his lip--despite Franks' many efforts to get him to do so.
> Franks couldn't get KJ to answer simple questions. Franks stated when she tried to ask KJ simple questions like how he got the scar on his elbow, he replied "yellow car." When she asked KJ how many fingers she was holding up, the three-year old replied on two occasions, "yep." When Franks asked him was he scared of anybody at home, he said monsters in the dark. All of this should have told Franks she was dealing with a toddler and she needed more to substantiate her suspicion that Mr. Cuzdey physically abused KJ--other than statements attributed to him from the daycare workers.
> This is the same three-year old who a few weeks earlier could not tell the first investigator, McNatt, his teachers' names despite having been at the daycare going on four months. He also could not explain to McNatt why he said his teacher was mean to him. He couldn't even tell McNatt who he lived with.

[Order at 24-25]. The hearing officer additionally found that CPS did not adequately follow up on leads that KJ's injuries were caused by his playmates at class. [*Id.* at 26-27].

Moreover, the hearing officer found that Mr. Cuzdey's denials of harming the boy were credible to him and that, even if the allegation that he had whipped KJ with a belt were deemed credible, then that would be insufficient to constitute abuse under CPS's policies. [*Id.* at 29-30].

In so concluding, the hearing officer wrote that, under CPS' own policies, "[p]hysical discipline, including spanking, performed on a child by a parent, guardian, or custodian in a reasonable manner shall not be deemed abuse under this specific section of Mississippi law." *Id.*

This court notes these findings parenthetically, but it wishes to stress that, even assuming that CPS employees made "the wrong call" in revoking plaintiffs' custody rights, this would, standing alone, by no means support plaintiffs filing a federal discrimination claim. Indeed, this court has neither the authority nor the inclination to second-guess state employees who are attempting in good faith to make decisions regarding the safety and welfare of a child, even if it believes that they made errors in doing so. On the other hand, this court becomes much more willing to examine the actions of such employees if the evidence suggests that they were not simply trying to call balls and strikes as best they could, but, rather, acted based upon an improper motive. For this reason, this court believes that the most significant part of the hearing officer's ruling, from a legal perspective, is found in the second footnote to the order. [Footnote 2 at 19]. In that footnote, the hearing officer wrote that:

> It appears that CPS did not follow their policy in removing KJ. Section 7.1 <u>Removals Due to Substantiated Investigation</u> of CPS's Investigations Policy & Procedure requires a youth court judge's approval prior to removal and that was not done here. *See* CPS Exhibit 1 at CPS Exhibits 0033. Section 7.2 Reasonable Efforts outlines what must be shown to the youth court to justify its recommendation for removal. *Id.* at CPS Exhibit 0034. Since CPS did not get the youth court's approval before KJ's removal, none of these requirements were done. Moreover, the policy even states "[a] finding of substantiated abuse or neglect does not, in and of itself, constitute grounds" for removal." *Id.* Additionally, Section 7.4 <u>Facilitation Removals</u> requires before removal [that] the workers must gather information on the child such as daily routine, needed therapeutic or medical, allergies cares, etc., and the child should be given an opportunity to collect things from the home that are meaningful to them. None of this was done before CPS's sudden and unplanned removal. **It appears CPS's removal of KJ was retaliatory given its failure to follow its policy – especially after CPS told the Cuzdeys earlier in the meeting that KJ would remain with them until after they found new placement. It was only after when Mr. Cuzdey voiced his desire to hire an attorney and appeal did CPS decide to remove KJ that day.**

[Fn. 2 at 19 (emphasis added)].

The highlighted portion of the hearing officer's ruling causes this court to question defendant's position that, whatever decisions its employees made in this case, they were made by individuals acting in good faith based solely upon concerns for the safety and welfare of a child. Of course, this court has already noted that plaintiffs have not asserted a federal retaliation claim in this case and that, even if they had, it would likely be barred by sovereign immunity. Still, this court believes that, if it were presently considering plaintiffs' discrimination claims under the *McDonnell Douglas* framework, defendant's stated non-discriminatory reason would likely be that it made good faith decisions based upon the best interests of a child. That being the case, it strikes this court that the last two sentences of footnote 2, highlighted above, represent the hearing officer essentially stating that he did not believe that this was the actual motivation for defendant's actions. Rather, the hearing officer clearly believed that defendant's employees were angry over plaintiffs' decision to hire counsel and file an appeal, and that they sought to retaliate against them on this basis. In the court's view, this fact serves to advance plaintiffs' discrimination claims at least to some degree, since the question of motive is a nebulous one which, in considering motions to dismiss under Rule 12 or on summary judgment, is difficult to resolve against the plaintiff, as the non-moving party.

The deferential Rule 12 standard of review aside, this court believes that defendant's complete failure to seek youth court approval before removing KJ from plaintiffs' home is something which is very difficult to explain or understand. In so stating, this court notes that, for the parties involved, the personal stakes involved in a decision to remove a child from his foster parents are extremely high, particularly in cases where, as here, the parents intend to adopt the child. The interest of the child in being free from an abusive environment is quite obvious, but it

seems clear that the stakes are very high for the foster parents as well. Naturally, foster parents may develop close emotional ties to their foster children, and having that child removed from their home can, no doubt, be quite traumatic. Moreover, there is clearly a grave reputational harm which is inflicted upon foster parents when they have a child removed from their home based upon findings of abuse. There are, quite appropriately, few individuals in society who are more reviled than those who harm children, and it seems clear that a finding that such abuse occurred at the hands of foster parents can have a devastating impact upon their standing in the community.

Given the personal stakes involved, it strikes this court as both appropriate and necessary that a judge make his or her own independent evaluation of the evidence and decide whether the removal of a child from his foster home is appropriate. As the agency responsible for handling foster care issues in this state, CPS was clearly aware, as an institution, of its own requirement for youth court approval of any decision to remove a child from his foster home. That being the case, it is difficult for this court to understand why defendant would have failed to follow its own policy before removing KJ from plaintiffs' home. Considering plaintiffs' allegations in the light most favorable to them, this court believes that defendant's failure to do so could reasonably be regarded as an indication that its employees suspected that the evidence of abuse was not strong enough to obtain youth court approval for removal and that they should accordingly act on their own. If so, then this would have been a reasonable suspicion on defendant's part, since the evidence did not, in fact, withstand the scrutiny of the hearing officer. Naturally, these circumstances raise further questions regarding the motivation for defendant's actions in this case, and it is difficult for this court to resolve such fact-intensive questions adversely to plaintiffs at the Rule 12 or summary judgment stage of the proceedings.

This court notes that, after KJ was removed from plaintiffs' home, something else

occurred which, it believes, defendant may find it very difficult to explain to a jury. In so

stating, this court is referring to the manner in which CPS, after it had already removed KJ from

plaintiffs' home without the required hearing, appeared to come very close to manufacturing

medical evidence in support of allegations that plaintiffs had been engaging in heinous forms of

neglect of the child.[7] In its motion to dismiss, defendant describes this medical investigation and

its result as follows:

> As the initial allegation of the second investigation centered on an allegation that the
> minor KSJ was "always hungry," the investigation included a medical examination /
> consultation of medical professionals for a health and weight assessment. (Doc. 29-1] at
> p.19. During this medical examination process, Franks learned that KSJ had ketones in
> his urine, and that KSJ's uncircumcised penis foreskin had become sore to the point
> where KSJ "screamed bloody murder" when the Nurse Practitioner tried to examine KSJ.
> Id. at pp. 32, 34. Accordingly, during the second investigation into physical neglect /
> physical abuse, the investigation came to include an allegation of medical neglect for KSJ
> as to both Mr. and Ms. Cuzdey. *Id*. at p. 12.
> The Cuzdeys were informed on September 28, 2022, of the results of this, the second
> investigation: The "physical neglect" allegations (relating to KSJ being hungry all the
> time) were unsubstantiated. However, because of the information obtained from KSJ
> himself, his daycare workers, and one of his consulting medical providers, the allegations
> of "physical abuse" and "medical neglect" were substantiated. Id. at p. 17.

[Brief at 5].

After carefully considering CPS' proof, the hearing officer concluded that defendant's

finding of medical neglect was "not supported by *any* credible evidence" (emphasis added), and,

having reviewed the record in this case, this court regards this conclusion as an entirely

reasonable one. In introducing his extensive discussion of the proof in this regard, the hearing

officer wrote that:

> I find that CPS's substantiated claim of medical neglect is not supported by any credible
> evidence. The sole basis for the medical neglect charge and for substantiating the charge

---

[7]It is possible that, in stating that defendant "came close" to manufacturing medical evidence in
this case, this court is being charitable.

was the single examination of KJ by a nurse practitioner from an urgent care center, who had no history of treating KJ. Franks later added and substantiated this allegation because the nurse practitioner told her there were ketones in KJ's urine, and, probably more so, because the foreskin of his uncircumcised penis would not retract. The nurse practitioner told her that ketones in KJ's urine was a sign that he was possibly starving and his body was breaking down muscle, i.e. was basically eating itself to survive. She told Franks that KJ was underweight for his age and his "BMI is so low it's almost not even on the chart." She also told Franks the inability of the foreskin to retract was medical neglect and was an "emergency" and KJ needed treatment for it "ASAP."

[*Id.* at 30].

This court regards the hearing officer's order as a rather devastating dissection of the medical "evidence" which defendant used to accuse plaintiffs of essentially starving their foster child and of failing to attend to his medical needs by properly caring for his penis. In utterly rejecting defendant's evidence that plaintiffs had been "starving" KJ, the hearing officer wrote that:

> [T]he nurse practitioner's opinions were contradicted by her own medical records. Just as important—if not more so-the nurse practitioner's opinions were refuted in real time by Dr. Benton, a renowned pediatrician and CPS's expert on child abuse and neglect, including medical neglect. First, the nurse practitioner's records contradict what she was telling Franks about KJ's weight. According to her medical records, KJ's BMI was flagged "Normal (14.7)(14%)"—hardly an indication his BMI was barely on the chart as she exclaimed to Franks. *See* CPS R5 at CPS Exhibits 0121. Comparatively, KJ's BMI from a few weeks earlier from his visit to Desoto Ear Nose Throat Clinic was 15.4--less than a point off the 14.7. *See* Cuzdey 6. The nurse practitioner's records had KJ's weight at "33 lb 6 oz (50%)". See CPS R5 at CPS Exhibits 0121. Per the Desoto Ear Nose Throat Clinic records, his weight in July was 35 pounds. He was down less than two pounds by the time he saw the nurse practitioner. *See* Cuzdey 6.
> Furthermore, CPS's expert, Dr. Benton, raised no concerns about KJ's weight from his review of the nurse practitioner's records. Also, Dr. Lee testified she saw nothing in the nurse practitioner's records that KJ was starving or was suffering from malnutrition. Dr. Lee further testified if one was to take the nurse practitioner's opinion as valid that KJ was malnourished in the 50th percentile, then that would mean that half of the entire population of all children were also malnourished given that they are beneath the 50th percentile. Even Franks' trained eyes told her that KJ was not starving. In her email to Dr. Benton, Franks said that KJ "appear[ed] to be of average size and does not appear to be underweight." *See* Cuzdey 36 at CPS Records 0035. Plus, the daycare staff told Franks that they fed the children everyday breakfast, lunch, and snacks, and KJ,

along with the other children, got extra meals and snacks. Given all this, the question becomes why did Franks believe the nursing practitioner's opinion that KJ was starving to the point his body was eating itself to survive?

[Order at 31-32]. The hearing officer thus found that Franks inexplicably relied upon the highly alarmist findings of a nurse practitioner, even after that nurse's findings were contradicted by her own medical records and by two medical doctors.

Defendant's "evidence" regarding plaintiffs' alleged failure to properly care for KJ's penis did not fare any better under the hearing officer's scrutiny. Specifically, the hearing officer wrote that:

Dr. Lee pointed out that nowhere in the nurse practitioner's records does she say KJ indicated he was in any kind of distress because of his penis. Dr. Lee pointed out the nurse practitioner did not prescribe any medication for his penis. She also pointed out that the nurse practitioner did not say anything about observing the penis being swollen or seeing any redness. In fact, the nurse practitioner's records said: "[t]he genitalia are normal." *See* CPS R5 at CPS Exhibits 0121. After Franks asked her to revise the records, the nurse practitioner added "Other inflammatory disorders of penis" to her records, but she did not say or describe what these "other inflammatory disorders" were. I also think it's telling that Franks had to ask the nurse practitioner to add things to her records. This is important because the nurse practitioner blamed the Cuzdeys for something that is common with uncircumcised males at KJ's age, i.e. the foreskin not retracting because it is not ready to be retracted. This is problematic because CPS adopted this medically unfounded opinion to substantiate medical neglect against the Cuzdeys. CPS's own expert raised no concerns about KJ's foreskin not retracting.

[Order at 33]. In reading these words, it is very much unclear to this court why it should be deemed appropriate for a CPS investigator to "ask the nurse practitioner to add things to her records" in making medical findings supporting horrific allegations of abuse, under any circumstances. Moreover, for Franks to have allegedly done so even after more experienced physicians contradicted the nurse practitioner's findings strikes this court as being beyond the pale.

In all but directly questioning Franks' objectivity and good faith, the hearing officer further wrote that:

However, when she received Dr. Benton's opinions that the ketones were not an issue and the foreskin usually don't retract until around age five; instead of at least considering taking KJ to be examined by Dr. Benton or some other pediatrician, [Franks] surprisingly called the nurse practitioner back and doubled downed on the nurse practitioner's opinions that her expert contradicted. It is at this point Franks prompted the nurse practitioner to revise her medical records to reflect that KJ exam had abnormal findings and he had "other inflammatory disorders of penis"—although the nurse practitioner did not say what these other disorders were. *See* Cuzdey 36 at CPS Record 0043-0044. The nurse practitioner further revised the medical records to add, among other things, information about the ketones and how KJ's penis did not get in "this kind of shape overnight--it happened over a period of weeks or even months." *Id.* at CPS Records 0043.

[Order at 35]. As noted previously, the hearing officer found that Dr. Benton was "a renowned pediatrician and CPS's expert on child abuse and neglect," [*id.* at 31] but it appears that, in absolving plaintiffs of both allegations of medical neglect against them, he did not give Franks the answer she was looking for. In so stating, this court reiterates the hearing officer's finding that Franks not only returned to the nurse practitioner whose views Dr. Benton (and Dr. Lee) had so heavily impeached, but "prompted [her] to revise her medical records" to provide even more incriminating "evidence." *Id.*

This court notes that it was at this point, after casting very serious doubt upon whether CPS' investigation of plaintiffs was made in good faith, that the hearing officer noted plaintiffs' own theory of what motivated defendant's actions in this case. Specifically, the hearing officer wrote that:

At the hearing, the Cuzdeys offered an explanation for CPS's behavior. They surmised there was a racial bias against them adopting KJ as he is Black; Mr. Cuzdey is part Asian and White; and Mrs. Cuzdey is White. They base their assertion on unexplained notations in CPS's records about cultural differences between KJ and the Cuzdeys. Nonetheless, I find that CPS should not have relied on the nurse practitioner's opinions and records to substantiate medical neglect against the Cuzdeys.

[*Id.* at 35]. The hearing officer thus offered no direct endorsement of plaintiffs' allegations of racial discrimination, but this court must wonder whether it was merely coincidental that he

noted plaintiffs' theory of defendant's motivation right after he himself had all but accused defendant (or at least its employee Franks) of acting in bad faith.

One thing which this court does know for certain is that accusing foster parents of failing to attend to the basic needs of a child in their custody is one of the most devastating accusations imaginable, and to seek to advance such accusations based upon the evidence noted in the hearing officer's order strikes it as being unconscionable. Moreover, the manner in which, the hearing officer found, Franks repeatedly asked the nurse practitioner to revise KJ's medical records in such a manner as to make them more consistent with allegations of medical neglect raises even more questions regarding defendant's good faith in this case. Indeed, after considering the hearing officer's report, this court must wonder what requests Franks may have made of the nurse practitioner which were not reflected in medical records.

Specifically, this court wonders whether the nurse practitioner was asked to make an objective review of KJ's medical status without any sort of preconceived notions, or whether she was, instead, led to believe that CPS was confident that KJ was the victim of abuse and, that being the case, it was important to have medical findings which would allow the child to be removed from abusive foster parents. The latter scenario would explain the highly alarmist tone in the nurse practitioner's findings, including references to KJ being "starved" even though his weight was recorded as "normal" and to his facing a medical "emergency" with regard to his foreskin's failure to retract, even though Dr. Benton noted that foreskins "usually don't retract until around age five." *Id.* Moreover, this court believes that CPS' decision to seek out the views of a nurse practitioner at an urgent care clinic in the first place, when it had its own resident pediatrician and expert on childhood abuse available, is highly suspect. Did CPS have

reason to believe that this particular nurse practitioner would "tell them what they wanted to hear"? This court wonders.

This court's suspicions regarding what may have gone on "behind the scenes" in CPS' dealings with the nurse practitioner is heightened by the fact that these events occurred only after defendant had chosen to remove KJ without the required court approval. In the court's view, this fact gives a taint of extrajudiciality and recklessness to this case, and it believes that this taint might legitimately impact upon a jury's view of what happened both before and after KJ's removal. In so stating, this court notes that while many of the hearing officer's observations regarding the early part of CPS' investigation might ordinarily be regarded as simple differences of opinion regarding the credibility of witnesses, the actions which defendant took in the latter stages of the investigation raise serious questions regarding its basic good faith in this case. Moreover, this court believes that, if jurors do conclude that CPS acted in bad faith in this case, then they might reasonably conclude that this bad faith was present from the start of the investigation.

Having noted its extreme doubts about defendant's conduct in this case, this court now turns to the primary legal question before it, which is whether plaintiffs have sufficient proof that defendant's actions in this case were the result of discrimination on the basis of race or national origin. This court has already noted its view that plaintiffs' strongest proof of improper motive in this case involves their allegation, supported by the hearing officer's order, that defendant acted in retaliation for their having hired a lawyer to pursue an appeal. Once again, however, an actual retaliation claim is not asserted by plaintiffs in their amended complaint and very likely could not be successfully asserted, considering the nature of the relevant federal statutes and the existence of sovereign immunity. Nevertheless, this court concludes that plaintiffs do have at

least some proof of race discrimination in this case which, while not overwhelming, is very likely sufficient to permit juries to consider it, when considered in the context of defendant's overall conduct in this case.

In considering the basic plausibility of plaintiffs' claims of racial discrimination, this court begins with the observation that, in spite of Mississippi having made great strides towards racial equality in recent decades, there are still many citizens of this state who continue to harbor prejudices against inter-racial relationships and families. This court presumes that defendant would not seek to dispute this point, and it regards it as unrealistic to expect or assume that no such individuals have found their way into the employment of CPS. In its brief, defendant argues that any suspicion of racial animus should be dispelled by the fact that it was aware of plaintiffs' racial backgrounds when it originally placed KJ in their custody, but this court does not agree. In so stating, this court notes its belief that, given the extensive federal laws against racial discrimination, including § 671(a)(18) in the adoption context, any blanket CPS policy against placing children with foster parents of a different race was not even a viable option for it.

Given federal law in this context, it seems clear to this court that even a reasonably widespread practice by CPS which sought to discourage interracial foster families would quickly be noticed, and federal courts in this state would enjoin it with little hesitation. That being the case, this court does not believe that CPS should be given excessive credit for placing KJ with plaintiffs in the first place, particularly considering the manner in which it investigated the allegations of abuse in this case. Indeed, the mere fact that defendant placed KJ with plaintiffs initially by no means renders it implausible that, when accusations of abuse against plaintiffs arose, racial prejudice on the part of one or more CPS employees might have led them to "place their thumb on the scale" in investigating the allegations against them. Moreover, the hearing

officer's ruling was replete with examples in which he concluded that CPS employees, particularly Franks, did appear to place their thumbs on the scale by giving credence to non-credible evidence implicating plaintiffs and by failing to follow up on leads, such as indications that KJ's slight injuries might have been caused by playmates, which pointed in another direction.

That brings this court to the fact that, in noting his belief in footnote 2 that retaliation may have motivated CPS' actions in this case, the hearing officer referenced Mr. Cuzdey's threat to hire an attorney during a meeting which occurred in early September 2022.[8] [*Id.* at 17]. This court regards this fact as significant, since the hearing officer's order notes that CPS first started investigating plaintiffs in July, 2022. [*Id.* at 2]. This means that a large percentage of the unreasonable credibility assessments and failures to follow up on exculpatory leads noted by the hearing officer in his ruling occurred *before* Mr. Cuzdey threatened to file suit. Naturally, this means that retaliation could not have been the cause of any earlier decision by Franks or some other CPS employee to "place their thumb on the scale" in favor of a finding that plaintiffs were guilty of abuse.

In light of the above considerations, this court might well find the circumstances of this case to be sufficiently suspicious to support allowing a jury to determine whether race discrimination was the reason for CPS' actions in this case, even without additional proof. This court notes, however, that plaintiffs do offer "something more," which this court does not necessarily regard as strong proof of discrimination, but which, it believes, does tend to advance their discrimination claim somewhat. The evidence to which this court is referring involves

---

[8] This court notes that there appears to be some uncertainty in the record regarding the exact date on which this occurred.

repeated references by CPS employees to "cultural differences" between the Cuzdeys and KJ, which plaintiffs allege were essentially code words for racial animus toward interracial families. As quoted above, the hearing officer noted in his ruling that plaintiffs "surmised there was a racial bias against them adopting KJ as he is Black; Mr. Cuzdey is part Asian and White; and Mrs. Cuzdey is White." *Id.* at 35.

In this vein, plaintiffs allege in their amended complaint that:

The following examples are illustrative of the latent racism permeating CPS: A. Despite being an American citizen, despite serving in the United States Marine Corps., and despite being born to a Caucasian-American father and Japanese mother, CPS investigation reports identify Mr. Cuzdey as "Asian". *See* documents previously produced and identified in the administrative appeal as Cuzdey - 35, page 1 of 18 ("Cuzdey Investigation I") and Cuzdey - 36, page 1 of 35 ("Cuzdey Investigation II"). B. On July 19, 2022, and regarding allegations concerning potty training techniques and Mr. Cuzdey's tone of verbal discipline in Investigation I, CPS SSS Mallory McNatt placed a phone call to CPS AS Angie Reed. According to McNatt, Reed "mentioned that Mr. [Cuzdey] is of different ethnic background (Asian) and noted that it may be a cultural thing." *See* document previously produced and identified in the administrative appeal as Cuzdey - 35, page 10 of 18. C. Later that same day, CPS SSS Mallory McNatt placed a separate phone call CPS RS Kimberly Young. According to McNatt, Young also "noted *their* Asian background and mentioned it may warrant further exploration." *Id.* (emphasis added to highlight the racism broadly and additionally directed at Mrs. Cuzdey who is actually caucasian). Young also added "*they* may have a bit different cultural techniques." *Id.* (emphasis added). D. On August 16, 2022, CPS employee Janice Johnson (position title unknown) wrote that her "[r]recommendation would include [CPS licensure employees] to discuss cultural practices with [the Cuzdeys] to ensure childrearing beliefs are in align (sic) with policy." *Id.* at page 9 of 18. E. At no time did McNatt or anyone else at CPS reprimand the aforementioned CPS employees, condemn the racist statements and undertones, nor distance the department from the same. Instead, the investigation and findings of Investigation I would become inexorably tethered to the Cuzdeys. While McNatt concluded that the complaints regarding potty training techniques and Mr. Cuzdey's use of a stern corrective voice did not rise to the level of maltreatment, Mr. Cuzdey's admission that he had on one occasion given the child a single, open-handed swat to the child's clothed rear-end merely to get his attention was a violation of the CPS policy against corporal punishment. McNatt described this benign occurrence as a "spat with hand to child's buttocks atop of diaper" but added that a licensure investigation may follow.

[Amended complaint at 12-13].

In considering these allegations, this court begins with its belief that there are circumstances in which it would be entirely appropriate for CPS employees to consider cultural factors in assessing the credibility of allegations of abuse. In so stating, this court takes judicial notice of the fact that certain cultures have very different understandings and practices regarding the rearing and discipline of children. Moreover, nothing in federal law requires CPS employees to defer to practices prevailing in other cultures when it finds them to constitute abuse under the standards which the agency has adopted. This court further believes that the state's interest in protecting children is so compelling that its employees must be permitted to "live in the real world," with all its complexities, in seeking to advance that interest. In the court's view, the state's interest in this regard would be seriously hindered if federal courts were to discourage the state's employees from considering all potentially relevant factors in assessing the credibility of allegations of mistreatment of a child.

Having said that, this court submits that there are some cases in which concerns about "cultural differences" are much more valid than others. To give one example, this court takes judicial notice of the fact that there are some cultures in which arranged marriages are common and in which it is socially acceptable for parents of a minor girl to pressure her into marrying a man of their choosing. That being the case, if CPS employees visited a particular home and learned that both foster parents had only recently come to this country from a nation which follows such practices, then this court believes that this is something which they might legitimately keep in mind in evaluating the evidence they collect. Moreover, if, in the course of doing so, CPS employees received information from a foster child that she was being pressured to marry a particular man, then this court would regard it as entirely appropriate for them to view this evidence as more credible based upon the family's cultural background. To do otherwise

would be to ignore the simple reality of cultural differences, and this court reiterates its belief

that CPS employees should be permitted to live in the real world in seeking to protect children.

Nevertheless, this court believes that the plaintiffs make quite reasonable allegations that,

in this particular case, there was nothing in their background which should have caused CPS

employees to harbor concerns about "cultural differences" posing a danger to KJ  This court has

already quoted the allegations of plaintiffs' complaint in this regard, and their brief closely tracks

those allegations.  Specifically, plaintiffs write in their brief that:

> In particular, they are focused on Mr. Cuzdey—an American citizen who honorably
> served in the Marine Corps and who outwardly displays a hint of some of his mother's
> Japanese ethnicity. The CPS workers never identified Mr. Cuzdey as American, but
> rather as Asian. *Id.* They characterize the tone of his verbal discipline as a product of his
> Asian background and a matter of his Asian culture. CPS wrote that foster licensing
> officials should examine his "cultural practices" to ensure those practices align with CPS
> policy. *Id.* They assert Mr. Cuzdey's Asian background warrants further exploration. Id.
> The Co-Plaintiffs alleged in their Complaint that "further exploration" is precisely what
> CPS did under the guise of the next meritless investigation, which CPS commenced on
> the very same day it concluded the first investigation. [ECF 29, pg. 13-14. * * * Given
> that the hearing officer determined there was no merit to any of CPS allegations of
> neglect, abuse, nor medical neglect and that the Cuzdeys' foster home should be
> reopened, the Co-Plaintiffs alleged in their Amended Complaint that it can be
> reasonably inferred from those facts that racism cloaked as "cultural differences" in CPS
> parlance was motivation for CPS's actions. [ECF 29, p. 15].

[Brief at 18-19].

This court regards this as a legitimate point of argument for plaintiffs, since, if CPS

employees had nothing more to substantiate their cultural concerns than the fact that one of the

two foster parents appeared to be Asian, then that is a far cry indeed from the hypothetical posed

above.  Still, this court would likely not find the references of CPS employees to "cultural

differences," standing alone, to constitute a basis for denying dismissal, if the evidence otherwise

suggested that those employees had done their level best to evaluate the evidence before them,

based on concerns for protecting a child.  In reality, however, this court is confronted with a state

agency which failed to follow its own policy requiring a judge to approve the removal of a child and which, in the case of Franks' interactions with the nurse practitioner, appeared to come dangerously close to manufacturing evidence in support of some of the most devastating allegations which can be made against a parent. It is *this* alleged conduct, more so than CPS employees' references to "cultural differences," which makes this court rather strongly inclined to allow a jury to decide what motivated defendant's actions in this case.

In making the above observations, this court notes its belief that *some* improper motivation appears to have been at work in this case, and, in cases where it concludes that such is the case, its inclination is to allow jurors to decide the inherently fact- and credibility-intensive question of what that motive was. In this vein, this court reiterates its belief that, while retaliation may be the most plausible reason for defendant's motivation, it cannot explain many of the concerns noted by the hearing officer in his order, since they involved incidents which predated Mr. Cuzdey's threat to hire counsel. Moreover, given that it is hardly implausible to believe that some CPS employees may harbor prejudices against inter-racial relationships and families, this court is inclined to allow jurors to evaluate plaintiffs' circumstantial proof, including the aforementioned references to "cultural differences," that race discrimination motivated CPS' actions in this case.

This court would additionally note that, while it seems clear that the hearing officer correctly regarded Franks' actions in this case as being the most suspect, it is very difficult for CPS to wash its hands of them. In so stating, this court notes that CPS' failure to obtain youth court approval prior to removing KJ from plaintiffs' home must be regarded as an institutional failure, and plaintiffs allege that, even after the hearing officer's devastating ruling, defendant

had to be dragged kicking and screaming into restoring full custody of KJ to them. Once again, plaintiffs allege that:

> 20. Despite the ruling in the administrative appeal, CPS officials later failed to adhere to a directive of the Marshall County Youth Court to reopen the Cuzdeys' foster home. Later still, CPS employees sought to impose tedious and burdensome prerequisites upon the return of the child, based upon the very allegations already found to have been baseless and despite the fact that such conditions had not been imposed while the allegations were first being investigated and the child remained in the home. Thus, CPS continued, post-appeal and contrary to court order, to wrongfully withhold K.S.J. from the Cuzdeys and failed to reopen their foster home. CPS's ongoing refusal forced the Cuzdeys' to file a Petition for Habeas Corpus in Youth Court.
>
> 21. On August 1, 2023—10 weeks after the Commissioner's acceptance of the findings and 11 months after K.S.J.'s wrongful removal—the Youth Court of Marshall County granted the Cuzdeys' Petition for Habeas Corpus thereby ordering K.S.J. to be reunited with the Cuzdeys, but over a graduated schedule to re-introduce K.S.J. to the Cuzdeys.

[Amended complaint at 6-7].

Plaintiffs thus allege that CPS "circled the wagons" around the ruling which had been so heavily impeached by the hearing officer's findings, in such a manner as to make it very difficult for it to distance itself from Franks' actions. Indeed, it strikes this court as quite arguable that CPS owed the Cuzdeys a heartfelt apology after reading the hearing officer's ruling, but they allege that defendant chose to go in the opposite direction, by doubling down on its earlier actions in this case. Accepting these allegations as true, this court concludes that plaintiffs have strong proof that CPS acted based upon *some* improper motive in this case, and it is, to reiterate, inclined to allow jurors to decide whether that improper motive was race discrimination. Defendant's motion to dismiss will therefore be denied.

It is therefore ordered that defendant's motion to dismiss is denied.

This, the 8th day of July, 2024.

<u>/s/ Michael P. Mills</u>
UNITED STATES DISTRICT JUDGE
NORTHERN DISTRICT OF MISSISSIPPI